IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LISA NUXOLL,<br>        **Plaintiff,**<br><br>v.<br><br>DETECTIVE MARTIN CONNORS,<br>        **Defendant.** | CIVIL ACTION<br><br><br><br>NO.  21-1030 |

**MEMORANDUM OPINION**

      Plaintiff, Lisa Nuxoll, a schoolteacher, tried to discipline one of her students.  That led to an altercation between her and the student which escalated into a situation involving the student's mother, the principal and the police culminating in Nuxoll's arrest and incarceration.  She maintains that her detention—for a charge that was later dismissed—was unlawful.  She now brings claims against Defendant Detective Martin Connors for false arrest, false imprisonment, and malicious prosecution pursuant to 42 U.S.C. § 1983 and state law.  Her claims are premised on allegations that Connors falsified and omitted material information in his Affidavit of Probable Cause in support of an arrest warrant.  Connors moves for summary judgment on all of Nuxoll's claims.  For the reasons that follow, his motion will be denied.

    **I.**    **BACKGROUND**

      From the outset, the parties agree on very little.  They do agree that Nuxoll was teaching a science class when she had a back and forth with one of her students, 15-year-old T.M.  According to Nuxoll, T.M. started acting out, and called her a "bitch," a "racist," and "not fair."  Nuxoll had a classroom rule that students were not allowed to get up from their seats without permission.  Nevertheless, T.M. walked up to her desk, pointed his fingers in the shape of a gun, made shooting noises at her, and told her, "I am going to shoot you."  According to T.M., none

1

of the above happened.  Instead, he and his friend M.H. were just "laughing and joking around."

Nuxoll did not see it that way.  The parties agree that at that point: (1) Nuxoll told T.M. that he was threatening her, and that he needed to leave the room; (2) she called him a "dingbat"; and, (3) when Nuxoll picked up the classroom telephone in an attempt to call for help in getting T.M. out of the room, he clicked down on the receiver and disconnected the line.  After another attempted call, Nuxoll managed to reach the school secretary, who told her that a school police office, Officer Butler, and the Dean, David Hensel, were on their way.

What happens next is hotly disputed by the parties.  According to Nuxoll, after T.M. finally took a few steps out of the room, she attempted to close the door; but T.M. "yanked" it back open, causing her to fall forward, lose her balance, and to make contact with his leg.

Shortly thereafter, Officer Butler and Hensel arrived and escorted T.M. to the principal's office.  T.M., however, returned to Nuxoll's room fifteen minutes later.  Nuxoll redialed the office letting them know that T.M. had returned; so Officer Butler and Hensel came back to the classroom and removed him again.  Nuxoll then resumed teaching her class, and ended the day like any other.

A few days after the incident, T.M. reported to another teacher, Ms. Smith, that Nuxoll pushed him out of the room and kicked him.  Although Smith had not witnessed the incident, she called T.M.'s mother and told her that Nuxoll had kicked her son.  Soon, T.M.'s mother and grandmother were in Principal Nelson Reyes's office, complaining about Nuxoll, and white and Hispanic teachers in general.  Reyes told T.M. to sit outside of his office during the meeting and draft a statement about the incident.  The statement reads in relevant part: "[Nuxoll] . . . said get out dingbat and she got up and start pushing me out the room and I asked her can I get my bag and she kicked me then I got mad and ask her why did you kicked me."

At some point someone called city police.  Police Officer Brenda Santiago arrived at the scene, and, while T.M. was writing his statement, spoke with him about what happened.  T.M. told Officer Santiago that "Nuxoll had told him to leave the classroom and that her foot had hit his leg when she was attempting to hold the classroom door open."  A few days later, T.M.'s mother went to the local police department and reported an assault.

Two investigations ensued from all of this: an internal investigation by Principal Reyes, and a Philadelphia police investigation by Detective Connors.  In conducting his investigation, Reyes spoke with Nuxoll and Hensel.  He also reviewed the information he received from T.M., T.M.'s mother, and Officer Butler.  Finally, Reyes looked at video footage which, in his view, "did not show any incident of kicking, just of the student leaving the classroom."  Reyes did not interview any other student witnesses because he believed their recollections were likely "tainted" by Smith, who had told T.M.'s mother, in front of the entire class, that Nuxoll had kicked T.M.  In an internal memo dated February 13, 2019, Reyes concluded that T.M.'s allegations were unfounded.

Detective Connors reached the opposite conclusion.  Unlike Reyes, he chose not to interview Nuxoll, instead reviewing a police report from Officer Santiago and speaking with: (1) T.M.; (2) T.M.'s friend, M.H.; (3) Officer Santiago; and, (4) Reyes.  T.M. repeated his allegations; denied misbehaving prior to the incident; and added that he overheard Nuxoll tell Hensel that she "kicked the shit out of him."  M.H. corroborated T.M.'s story, but unlike his friend, concluded that T.M. was acting out when the incident occurred.  Officer Santiago explained that T.M. told her "that [Nuxoll's] foot had hit his leg when she was attempting to hold the classroom door open."  Finally, Reyes told Connors that "Nuxoll had been disciplined following an internal investigation and was suspended for (3) days without pay."  As explained

3

*infra*, Nuxoll asserts that this last statement was fabricated.

Based on the above, Connors concluded that he had probable cause to submit an affidavit in support of an arrest warrant for Nuxoll. A week later, while she was teaching class, Nuxoll was served with a summons. At the advice of her attorney, she turned herself in to the Third District Police Department, where she was arrested and incarcerated from 9:00 am to 3:45 am the next morning. When Nuxoll was released, a doctor diagnosed her with high blood pressure and hypertension, which she asserts was caused by the extreme stress of the foregoing events. Shortly thereafter, Nuxoll's simple assault charge was dismissed by a Philadelphia Municipal Court judge.[1]

## II. STANDARD OF REVIEW

Nuxoll's Complaint sets forth claims under both federal and state law for: (1) false arrest; (2) false imprisonment; and, (3) malicious prosecution. The Complaint also contains a federal law claim for fabrication of evidence and a state law claim for intentional infliction of emotional distress.

The last two claims can quickly be addressed. First, Nuxoll explained in her Opposition to Connors's Motion for Summary Judgment that she is abandoning her state law infliction of emotion distress claim. As to the fabrication of evidence claim, a plaintiff may bring "a stand-alone fabricated evidence claim against state actors under the due process clause of the Fourteenth Amendment." *Halsey v. Pfeiffer*, 750 F.3d 273, 294 (3d Cir. 2014); *see also Black v.*

---

[1] In his Statement of Undisputed Facts, Connors asserts (and cites to Nuxoll's deposition in support of that assertion) that Nuxoll "reported her criminal matter was dismissed but did not provide supporting documentation." Nuxoll testified at her deposition that the charge against her was dismissed on motion to the judge handling the matter. Connors and Nuxoll's counsels then agreed to talk about documents in support of the dismissal – but no such documents are included in the evidentiary record. Given that Nuxoll has testified under oath that the charge was dismissed and there is no other record evidence to the contrary, viewing the facts in the light most favorable to Nuxoll, the Court will conclude for purposes of this motion that the charge was in fact dropped.

*Montgomery Cnty.*, 835 F.3d 358, 371-72 (3d Cir. 2016), as amended (Sept. 16, 2016).  Connors entirely ignored Nuxoll's fabrication of evidence claim in his opening Motion, raising arguments as to why the claim should be dismissed for the first time in his Reply.  Connors thus has waived any arguments as to the merits of the claim, foreclosing summary judgment on it.  *See Laborers' Int'l Union v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 398 (3d Cir. 1994); *see, e.g., Stafford v. Morris*, 816 F. App'x 712, 718. n.2 (3d Cir. 2020) (noting that appellant "forfeited his false arrest and false imprisonment claims because he failed to raise them adequately in his opening brief.")

The claims that remain to be addressed are the state and federal law claims for false arrest, false imprisonment, and malicious prosecution, each of which turns on the existence of probable cause.

**A.  Probable Cause**

To bring a Section 1983 claim for either false arrest or false imprisonment under the Fourth Amendment, a plaintiff must show: "(1) that there was an arrest; and (2) that the arrest was made <u>without probable cause</u>."  *James v. City of Wilkes-Barre*, 700 F.3d 675, 680 (3d Cir. 2012) (citation omitted) (emphasis added); *Brockington v. City of Phila.*, 354 F. Supp.2d 563, 570 n.8 (E.D. Pa. 2005) (false arrest and false imprisonment are "nearly identical claims" that are often analyzed together).  And, to prevail on a malicious prosecution claim under Section 1983, a plaintiff must establish that "(1) the defendant[] initiated a criminal proceeding; (2) the criminal proceeding ended in [her] favor; (3) the proceeding was initiated <u>without probable cause</u>; (4) the defendant[] acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) [she] suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding."  *DiBella v. Borough of Beachwood*, 407 F.3d 599, 601 (3d Cir. 2005)

(emphasis added).[2]

Probable cause, in turn, "exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 467 (3d Cir. 2016) (quoting *Orsatti v. N.J. State Police* 71 F.3d 480, 483 (3d Cir. 1995)).  Put simply, "[p]robable cause exists where there is a 'fair probability' that the person committed the crime at issue." *Id*.

There is an inherent tension "in evaluating probable cause at the summary judgment stage.  On the one hand, the summary judgment standard asks whether there is a 'genuine dispute as to any material fact, [o]n the other hand, the probable cause standard . . . allows for the existence of conflicting, even irreconcilable, evidence." *Dempsey*, 834 F.3d at 468 (quoting Fed. R. Civ. P. 56(a)).  In light of this tension, the Third Circuit has noted that a "determination [of probable cause] is necessarily fact-intensive, and it will usually be appropriate for a jury to determine whether probable cause existed." *Id*.  "Nevertheless, summary judgment may be granted on the question of probable cause if a court concludes that the evidence, viewed most favorably to the nonmoving party, reasonably would not support a contrary factual finding." *Id*. (alterations and quotation marks omitted).  The question to be answered is "whether no reasonable jury could find a lack of probable cause such that summary judgment in favor of [a] defendant officer[] is appropriate." *Id*. at 468 n.6 (quotation marks omitted).

---

[2] Connors's only argument in favor of summary judgment on Nuxoll's malicious prosecution claims (both federal and state) is that Nuxoll has not met the probable cause requirement.  Other arguments he raised in his reply brief are waived. *Laborers' Int'l Union*, 26 F.3d at 398 ("An issue is waived unless a party raises it in its opening brief. . ." (citation omitted) (ellipsis in original)), *cert. denied*, 513 U.S. 946 (1994).  Thus, these claims rise or fall on the probable cause analysis.

### B. Analytical Framework

As noted above, "false arrest and malicious prosecution [claims] 'hinge on probable cause.'" *See Andrews v. Scuilli*, 853 F.3d 690, 697 (3d Cir. 2017)). "[A]n arrest warrant will issue only if 'a neutral and detached magistrate' agrees with the officer that probable cause exists." *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 469 (3d Cir. 2016). Therefore, generally, there is probable cause to arrest when "a police officer makes an arrest pursuant to a warrant which meets the requirements of the Fourth Amendment." *Baker v. McCollan*, 443 U.S. 137, 144 (1979). But the existence of probable cause is called into question when a plaintiff shows that the "the [] officer knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create[d] a falsehood in applying for a warrant," and that those assertions or omissions were "material, or necessary, to the finding of probable cause." *Sherwood v. Mulvhill*, 113 F.3d 396, 399 (3d Cir. 1997).

Whether a challenged affidavit supports probable cause is analyzed at summary judgment in three steps. *Dempsey*, 834 F.3d at 470-71. First, the evidence is reviewed to determine whether a reasonable jury could conclude that [the defendant officer] made statements or omissions that he 'knew [were] false, or would have known [were] false except for his reckless disregard for the truth.'" *Wilson v. Russo*, 212 F.3d 781, 787 (3d Cir. 2000). Assertions are made with reckless disregard when "the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *Id.* at 788. Omissions are made with reckless disregard where "an officer withholds a fact in his ken that 'any reasonable person would have known . . . was the kind of thing the judge would wish to know.'" *Id.* In making this initial determination, the evidence must be reviewed from a lens of "scrupulous neutrality," not the "deliberately slanted perspective" usually taken at

7

summary judgment. *Dempsey*, 834 F.3d at 470-71 (quoting *Reedy v. Evanson*, 615 F.3d 197, 214 n.24 (3d Cir. 2010)).

Second, the affidavit is "reconstructed" to: (1) include any recklessly omitted information; (2) exclude any misleading or false assertions; and, (3) include any other information in the record that was known to the officer which "gives context to or affects the weight to be accorded" the assertions or omissions. *Id.* at 474-75. This process requires a "literal, word-by-word reconstruction[] of [the] challenged affidavit[]" to facilitate review of the determination. *Id*. at 470.

Finally, using the newly reconstructed affidavit, the question becomes whether the recklessly omitted statements or falsehoods were "material, or necessary to the finding of probable cause." *Id.* at 477 (quotation marks omitted).

## III. CONTESTED STATEMENTS

Nuxoll asserts that Connors recklessly made false assertions in his affidavit in support of her arrest. The affidavit he submitted is presented below, with the allegedly fabricated assertion highlighted in bold:

> On Wednesday, February 12, 2019, the complainant, with his mother, reported an assault that took place inside Taggert Elementary School, 400 Porter Street that occurred on February 4, 2019 at 1:20 PM. The complainant stated that the offender identified as his science teacher, Lisa Nuxoll 57 W/F, had kicked him in the legs and forced him out of the classroom. The complainant's mother, per the report, had spoken with the school and filed a complaint with the school board. The mother further stated that the incident in part (sic) an on-going problem with the staff at Taggert Elementary School.
>
> The complainant was transported to South Detective Division where he was interviewed with his mother present. The complainant states, in his interview, he was getting his laptop and stopped while he was up to get a piece of candy from a friend. The complainant stated that this is when his

teacher grabbed[3] him, called him a dingbat and proceeded to kick him in the legs as she was pushing him out of the classroom. The complainant further stated that Nuxoll had then called the principal's office stating that he had just threatened her.

The complainant was asked if he and the other student were not properly behaving. The complainant stated, "We were joking, laughing, and talking." The complainant provided the name of the other student and did state he did not require medical injury. The complainant stated that the dean of students and a School District Police Officer came to the room when he heard Nuxoll saying "I kicked the shit out of him."

On February 15, 2019, the assigned called the principal of the school in regards to the incident reported. The principal explained that he had believed that the situation was remedied and had spoken to the complainant's mother the morning of Wednesday, February 12, 2019 - prior to the police report that was written at 1:15 PM.

The principal stated that on February 7, 2019, the complainant's mother and grandmother both came to the school; the grandmother arriving first and creating a disturbance making derogatory and racial statements regarding white and Hispanic, particularly Puerto Rican, teachers. The matter was discussed with the complainant's mother and the principal; the principal stated to the assigned that police were called and police report was written.

**The principal explained that Nuxoll had been disciplined following an internal investigation and was suspended for three (3) days without pay.** The principal also further stated that the other teacher that had called the complainant's mother did so outside of normal procedures and was also disciplined. Further the Department of Human Services was also conducting an investigation. The principal added that the complainant at the time of the incident was reported to have pointed his fingers at Nuxoll in a gun fashion and made shooting sounds such as "pow-pow-pow-pow."

The assigned obtained from the 3rd Police District a copy of the 75-48, DC# 2019-03-008305, written by Police Officers Sanchez #5716 and Santiago #5172, assigned as 3SC1 on February 7, 2019 for a disturbance involving the complainant and Nuxoll. P/O Santiago was interviewed regarding what she observed and witnessed. The officer further stated in her interview that all parties were advised.

The complainant had named the student from whom he received candy from and was talking with at the time of the incident. The assigned

---

[3] The affidavit states that T.M. told Connors that Nuxoll "*grabbed* him . . . and proceeded to kick him." Connors's interview record, however, shows that T.M. did not use the word "grab" to describe the incident. Rather, T.M. had used the word to describe a moment in December 2018 when Nuxoll "grabbed [him] by [his] arm and pulled [him] into line."

>obtained that student's information from School Board investigators and contacted that student's mother and requested that her son be interviewed concerning the incident. According to this student, he and the complainant were joking and laughing prior to the incident when Nuxoll approached the complainant and began to yell at him and called him a "ding-bat." Nuxoll then told the complainant to get out of her classroom and he ran towards the door and then turned around. Nuxoll then began to kick the inside of the complainant's lower leg. The next day, the Math teacher, in front of the class had the complainant call his mother and tell her what happened with the other teacher and told to leave the class and being kicked in the leg.

Nuxoll also asserts that Connors recklessly omitted from the affidavit Officer Santiago's descriptions of T.M.'s complaint, as she provided in her interview—"[Nuxoll's] foot had *hit his leg* when she was attempting to hold the classroom door open" and in her police report—"[T.M.] state[d] [Nuxoll] told him to leave her classroom and put her foot on the door *hitting Complainant on his leg*." (Emphasis added). In short, Nuxoll asserts that Connors omitted from his affidavit the fact that Officer Santiago did not recount T.M.'s complaint as one involving a "kick."

There are thus two questions to consider in analyzing Connor's affidavit. The first is whether he included fabricated information and the second is whether he omitted information that should have been included.

### A. Statement Regarding Discipline

Turning first to the question of whether Connors's assertion in his affidavit that he learned from Principal Reyes on February 15th that Nuxoll had been "disciplined following an internal investigation [of the incident] and was suspended for three (3) days without pay" was fabricated. Reyes's statements are exactly to the contrary. In a sworn affidavit, he states that he does not "recall speaking with Detective Connors," and that he "definitely did not tell [Connors] that Ms. Nuxoll had been suspended for three days nor did [he] tell [Connors] she had been disciplined in any way" as a result of the incident. Further, in a memorandum setting forth the

10

results of his internal investigation memo, which is dated two days before the date that Connors asserted he and Reyes had a conversation, Reyes concludes that T.M.'s allegations were unfounded. A scrupulous neutral could find it unreasonable that Reyes would conclude that T.M.'s allegations were unfounded, and then, two days later, tell Connors that Nuxoll had been suspended as a result of the incident. Rather than credit Connors's assertion that Reyes had told him that Nuxoll had been disciplined, a reasonable jury may be more inclined to credit the statement Reyes made in his memo that he "encouraged Ms. Nuxoll to continue her classroom management procedures, which have been exemplary."

### B. Officer Santiago's descriptions of T.M.'s complaint

Nuxoll also asserts that Connors recklessly omitted from the affidavit information he received from Officer Santiago regarding her impression of T.M.'s complaints. Those statements relay the complaints as (1) Nuxoll's "foot [hitting] his leg when she was attempting to hold the classroom door open"; and, (2) Nuxoll "put[ting] her foot on the door hitting [T.M.] on his leg." In Nuxoll's view, the fact that Officer Santiago never mentioned the word "kick" suggests that the incident was actually an accident, information that a "reasonable person would have known . . . [a] judge would wish to know." *Wilson*, 212 F.3d at 788. Information is recklessly omitted when it is (1) known to the officer at the time of swearing the affidavit; and, (2) "relevant to the existence of probable cause." *Dempsey*, 834 F.3d at 471.

Here too, weighing the evidence from a point of "scrupulous neutrality," Connors could be found to have acted with reckless disregard for the truth. First, it is undisputed that he had knowledge of Officer Santiago's statements at the time he swore the affidavit. Second, the evidence is clearly relevant to the existence of probable cause: Nuxoll was charged with simple assault, a crime which under Pennsylvania law cannot be committed without some degree of

intent. Given that all of the other evidence in the affidavit suggests that Nuxoll purposefully "kicked" T.M., a characterization to the contrary—or at least a characterization that does not use the word "kick"—would constitute information that "could affect the probable cause determination." *See, e.g., Dempsey*, 834 F.3d at 471 (holding that where original affidavit only contained statements by victim, it was reckless to omit relevant, but not plainly exculpatory, statements by additional witnesses).

At the very least, Officer Santiago's statements present a factual ambiguity regarding her understanding of the incident to be resolved by a jury. *See Coolspring Stone Supply v. Am. States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir. 1993) (noting that summary judgment is inappropriate when a case may turn on credibility determinations).

### C. Additional information known to Connors

Finally, where additional information in the record "gives context to or affects the weight to be accorded the recklessly omitted information . . . that [additional information] also should be . . . included in the reconstructed affidavit." *Dempsey*, 834 F.3d at 474-75. Here, whether the following information could materially affect the probable cause analysis is one for the jury.

First, when Connors asked T.M. during his interview whether he was "goofing off and upsetting the teacher," T.M. responded by stating, "we were joking, laughing, and talking." When Connors asked whether T.M. was ignoring any instructions to be seated or settle down prior to the incident, T.M. responded that he was not. By contrast, M.H. conceded during his interview that T.M. was disregarding Nuxoll's instructions, stating that "[T.M.] wasn't listening [to Nuxoll]." And when asked whether T.M. is "usually unruly in class or disrespectful to teachers," M.H. replied, "No—he's like that only in two classes. That's Miss Nuxoll's class or when we have a substitute teacher." These facts are relevant to the credibility of the two

witnesses who feature prominently in the affidavit.

Similarly, the affidavit states that, according to Reyes, T.M. "was reported to have pointed his fingers at Nuxoll" in the shape of a gun. But it does not mention that M.H. denied this allegation during his interview, a fact that is also relevant to the credibility of these witnesses.

## IV.   RECONSTRUCTED AFFIDAVIT

In sum, the "reconstructed" affidavit could: (1) exclude the statement Connors allegedly received from Reyes concerning Nuxoll's "suspension"; (2) include the fact that three days after the incident, T.M. only told Officer Santiago that Nuxoll's foot "hit his leg when she was attempting to holding the door open", (3) include T.M.'s denial of his misbehavior prior to the incident, and M.H.'s concession of the same; as well as the fact that T.M. was usually unruly in Nuxoll's class; and, (4) include M.H.'s denial of the assertion that T.M. pretended to shoot at Nuxoll.

With each of those edits, the reconstructed affidavit would thus read as follows:

> On Wednesday, February 12, 2019, the complainant, with his mother, reported an assault that took place inside Taggert Elementary School, 400 Porter Street that occurred on February 4, 2019 at 1:20 PM. The complainant stated that the offender identified as his science teacher, Lisa Nuxoll 57 W/F, had kicked him in the legs and forced him out of the classroom. The complainant's mother, per the report, had spoken with the school and filed a complaint with the school board. The mother further stated that the incident i[s] part an on-going problem with the staff at Taggert Elementary School.
>
> The complainant was transported to South Detective Division where he was interviewed with his mother present. The complainant had named the student from whom he received candy from and was talking with at the time of the incident. The assigned obtained that student's information from School Board investigators and contacted that student's mother and requested that her son be interviewed concerning the incident.
>
> The assigned [further] obtained from the 3rd Police District a copy of the 75-48, DC# 2019-03-008305, written by Police Officers Sanchez #5716

13

and Santiago #5172, assigned as 3SC1 on February 7, 2019 for a disturbance involving the complainant and Nuxoll.  **[P/O Santiago spoke to Complainant about the incident on February 7, 2019].**  P/O Santiago was interviewed regarding what she observed and witnessed.  The officer further stated in her interview that all parties were advised.

The complainant states, in his interview, [on February 12th, that] he was getting his laptop and stopped while he was up to get a piece of candy from a friend.  The complainant stated that this is when his teacher grabbed him, called him a dingbat and proceeded to kick him in the legs as she was pushing him out of the classroom.  The complainant further stated that Nuxoll had then called the principal's office stating that he had just threatened her.  The complainant stated that the dean of students and a School District Police Officer came to the room when he heard Nuxoll saying "I kicked the shit out of him."

**[Officer Santiago, however, said during her interview that on February 7, complainant had only told her that "Nuxoll had told [complainant] to leave the classroom and that her foot had hit his leg when she was attempting to hold the classroom door open." Officer Santiago's incident report from that day states the following: "Comp[lainant] states [Nuxoll] told him to leave her classroom and put her foot on the door hitting Complainant on his leg."]**.

[The complainant's friend, in his interview, stated that] he and the complainant were joking and laughing prior to the incident when Nuxoll approached the complainant and began to yell at him and called him a "ding-bat."  Nuxoll then told the complainant to get out of her classroom and he ran towards the door and then turned around.  Nuxoll then began to kick the inside of the complainant's lower leg.  The next day, the Math teacher, in front of the class had the complainant call his mother and tell her what happened with the other teacher.  [The Math teacher told complainant to tell his mother that he was] told to leave [Nuxoll's] class and [that he was] kick[ed] in the leg.

The complainant [and his friend were also] asked if he and the other student were not properly behaving [prior to the incident].  The complainant stated "We were joking, laughing, and talking."  **[The Complainant denied ignoring any instructions by his teacher to be seated or settled down at the time of the incident.  However, the Complainant's friend stated that Complainant was in fact disregarding Nuxoll's instructions prior to the incident and "wasn't listening [to her]."  The same friend confirmed that Complainant is usually unruly and disrespectful in Nuxoll's class.]**

The complainant ~~provided the name of the other student and did~~ state[d] he did not require medical [attention], [**a fact confirmed by Complainant's friend and Officer Santiago.  Officer Santiago further**

14

**stated that Complainant never mentioned being in pain as a result of the incident.]**

On February 15, 2019, the assigned [also] called the principal of the school [with] regard[] to the incident reported. The principal explained that he had believed that the situation was remedied and had spoken to the complainant's mother the morning of Wednesday, February 12, 2019 - prior to the police report that was written at 1:15 PM.

The principal stated that on February 7, 2019, the complainant's mother and grandmother both came to the school; the grandmother arriving first and creating a disturbance making derogatory and racial statements regarding white and Hispanic, particularly Puerto Rican, teachers. The matter was discussed with the complainant's mother and the principal; the principal stated to the assigned that police were called and police report was written.

The principal explained that ~~Nuxoll had been disciplined following an internal investigation and was suspended for three (3) days without pay. The principal also further stated that~~ the other teacher that had called the complainant's mother did so outside of normal procedures and was ~~also~~ disciplined. Further the Department of Human Services was also conducting an investigation. The principal added that the complainant at the time of the incident was reported to have pointed his fingers at Nuxoll in a gun fashion and made shooting sounds such as "pow-pow-pow-pow." **[The Complainant's friend denied seeing Complainant make gestures or sounds imitating a gun.]**

## V. MATERIALITY

Having reconstructed the affidavit, the question now is "whether the recklessly omitted statements" or falsehoods were "material, or necessary, to the finding of probable cause." *Dempsey*, 834 F.3d at 477 (quotation marks omitted). In making this determination, "the corrected affidavit . . . simply becomes one more set of factual assertions that must then be viewed in the light most favorable to the non-movant." *Reedy*, 615 F.3d at 214 n.24.

Here, Nuxoll was charged with simple assault, which is defined in relevant part as an "attempt[] to cause or intentionally, knowingly, or recklessly cause bodily injury," to another. 18 Pa. C.S. § 2701(a)(1). Probable cause therefore exists if there is a "fair probability," *Dempsey*, 834 F.3d at 467, that Nuxoll either (1) attempted to cause an injury to T.M.; or, (2)

15

internationally, knowingly, or recklessly caused injury to him.

The statement by T.M. that Nuxoll had kicked him along with M.H.'s corroboration of that statement support a finding of probable cause: "statements of a victim witness are typically sufficient to establish probable cause in the absence of [i]ndependent exculpatory evidence or substantial evidence of [a] witness's own unreliability that outweigh[s] the probable cause that otherwise exists." *Dempsey*, 834 F.3d at 477-78 (alterations in original).  The parties do not dispute that, absent any other facts, these statements would typically be sufficient to find probable cause.  Rather, they dispute whether other evidence that was available to Connors outweighs such a finding.  A reasonable jury, reviewing the evidence, could find that it does.

At the conclusion of his investigation, Connors was aware of a notable inconsistency between what T.M. told him and what Officer Santiago told him.  The difference between accidental contact and a deliberate kick is of critical importance in this context .  Further, Connors knew there was a discrepancy between how T.M. described his behavior just before he left the classroom (he denied any misbehavior) and his friend M.H. (who suggested otherwise).  Even how T.M. left the classroom is in dispute (T.M. says Nuxoll "grabbed" and "pushed" him while M.H. says T.M. as having "r[un] towards the door and turned around").  And finally, Connors knew that M.H. denied seeing T.M. pretending to shoot at Nuxoll, in contradiction of what Reyes had told Connors during his interview.  Here "*the combined effect* of the omissions and misrepresentations suffices to call into question the reliability of the affiant and the affiant's witnesses such that the question of probable cause cannot be resolved on a summary judgment motion." *Andrews*, 853 F.3d at 703 n.16 (emphasis added).  Whether the falsehoods or omitted statements were necessary to the finding of probable cause is a question for the fact finder to decide.

**D. Qualified Immunity**

Connors argues that he is shielded from liability in this matter by the doctrine of qualified immunity. "Police officers, embodying the authority of the state, are liable under [Section] 1983 when they violate someone's constitutional rights, unless they are protected by qualified immunity." *Peroza-Benitez v. Smith*, 994 F.3d 157, 165 (3d Cir. 2021) (citation omitted). The qualified immunity inquiry considers: (1) whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right," and, (2) "whether the right was clearly established, such that 'it would [have been] clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Id.* (citations omitted). At summary judgment, the officer bears the burden of establishing his entitlement to qualified immunity. *Jefferson v. Lias*, 21 F.4th 74, 80 (3d Cir. 2021).

Connors's argues that it was not clearly established at the time of the arrest that an officer would lack probable cause to arrest an individual for simple assault if, as in this case, three (3) witnesses, including [Nuxoll], confirmed the allegations. Connors's reference to Nuxoll's "confirmation" of the accusation, however, is merely a misstatement of Nuxoll's deposition testimony, which is that her leg unintentionally "made contact" with (*i.e.*, touched) T.M.'s when she struggled to open the door. But the focus of the qualified immunity analysis here is not on how many people Connors interviewed in his investigation, it is whether it is clearly established that there is a "a right to be free from arrest except on probable cause". And, as the Third Circuit has unequivocally stated: "[t]here is no question that . . . the right to be free from arrest except on probable cause, [is] clearly established," and "grounded in well-settled law." *Andrews*, 853 F.3d at 705. "Similarly, the right to be free from prosecutions on criminal charges

that lack probable cause was also known and clearly established." *See id. Donahue v. Gavin*, 280 F.3d 371, 379 (3d Cir. 2002). Thus, Connors is not protected by qualified immunity from Nuxoll's malicious prosecution claim.

## VI. SUPPLEMENTAL STATE LAW CLAIMS

Nuxoll also brings state law claims for: (1) false arrest; (2) false imprisonment; and, (3) malicious prosecution. As with federal law, in Pennsylvania the torts of "false arrest and false imprisonment are essentially the same claim*." See Olender v. Twp. of Bensalem,* 32 F. Supp.2d 775, 791 (E.D. Pa. 1999). "A false arrest is defined as 1) an arrest made without probable cause or 2) an arrest made by a person without privilege to do so." *Renk v. City of Pittsburgh*, 641 A.2d 289, 295 n.2 (1994) (citing Pennsylvania Suggested Standard Civil Jury Instructions § 13.04). To prove a malicious prosecution claim under Pennsylvania law, a plaintiff must show that the defendant "instituted proceedings against the plaintiff (1) without probable cause, (2) with malice, and (3) the proceedings must have terminated in favor of the plaintiff." *Zimmerman v. Corbett*, 873 F.3d 414, 418 (3d Cir. 2017). "Malice may be inferred from want of probable cause." *Hugee v. Pa. R.R. Co.*, 101 A.2d 740, 743 (Pa. 1954). Thus, as under federal law, a plaintiff who brings claims for false arrest, false imprisonment, and malicious prosecution under Pennsylvania law must show that the defendant acted without probable cause. And the only argument Connors puts forward regarding Nuxoll's state law claims is that he had probable cause to request a warrant for her arrest.

In Pennsylvania, "[p]robable cause to arrest exists when the facts and circumstances within the police officer's knowledge and of which the officer has reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution [to] belie[ve] that an offense has been committed by the person to be arrested". *Commonwealth v. Gwynn*, 723

A.2d 143, 148 (Pa. 1998) (citing *Beck v. Ohio*, 379 U.S. 89, 85 (1964)). "Usually, the existence of probable cause is a question of law for the court rather than a jury question, but may be submitted to the jury when facts material to the issue of probable cause are in controversy." *Kelley v. General Teamsters Chauffers & Helpers, Loc. Union 249*, 544 A.2d 940, 941 (Pa. 1988); *Avery v. Mitchell*, 1999 WL 240339, at *11 (E.D. Pa. Apr. 1999) (noting that summary judgment cannot be granted on state false imprisonment claim if "the lawfulness of the detention remains an issue" for trial).

For the reasons set forth above there are numerous disputes of fact material to the probable cause analysis for both the federal and state law claims that do not warrant granted summary judgment on those claims. Accordingly, Defendant's summary judgment motion shall be denied.

An appropriate order follows.

                                                      **BY THE COURT:**

                                                      /s/Wendy Beetlestone, J.

                                                      **WENDY BEETLESTONE, J.**